**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **REBECCA CAMPBELL** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **DREXEL UNIVERSITY, LEWIS BENNETT, FERNE COHEN, and TARA HAFYCZ** | : | **NO. 24-192** |

**MEMORANDUM OPINION**

**Savage, J.** **September 30, 2026**

Rebecca Campbell, a former student in Drexel University's Certified Registered Nurse Anesthetist program, sued Drexel, administrators Lewis Bennett and Ferne Cohen, and clinical coordinator Tara Hafycz for pregnancy discrimination and retaliation when they dismissed her from the program. A jury found that Drexel and Hafycz did not discriminate or retaliate against her. It found Bennett and Cohen did not discriminate against her because of her pregnancy, but did retaliate against her. Bennett and Cohen move for judgment notwithstanding the verdict ("JNOV"), arguing Campbell failed to prove retaliation. In the alternative, they argue evidentiary rulings and prejudicial statements made by Campbell and her counsel warrant a new trial.

We will deny the defendants' motion for JNOV because the verdict is supported by the evidence. We will grant the motion for a new trial, not for the reasons they argue, but because the erroneous jury instructions permitted the jury to find the defendants liable for lawful conduct.

**Background**

In the spring of 2022, Campbell was in her second year of Drexel University's Certified Registered Nurse Anesthetist ("CRNA") program and completing the clinical

component at ChristianaCare Hospital ("Christiana").[1] Anesthesia care providers at Christiana are employed by third-party provider Anesthesia Services ("ASPA").[2]

At the time, Campbell was pregnant and anticipating taking maternity leave in the fall of 2022.[3] In February 2022, in anticipation of her leave, Campbell reached out to Bennett, the Chair of the CRNA program,[4] to ask whether she could schedule and complete extra clinical hours prior to her maternity leave so that she would have fewer clinical hours to make up upon her return.[5] After Bennett informed her that banking her hours was not an option,[6] she reached out to Drexel's Office of Equality and Diversity ("OED") for clarity on her options for making up missed time.[7] On March 1, 2022, she spoke with Drexel's Director of Equal Opportunity and Title IX Compliance Zoe Reilly.[8] Campbell told Reilly she believed her scheduling request was denied on account of her sex and pregnancy.[9] Specifically, she complained she was "being treated differently than [her] male counterparts requesting paternity leave and the other students who were not pregnant getting leave."[10]

---

[1] Trial Tr. 5:8–10, Sept. 16, 2025, ECF No. 183 ["Trial Tr. Vol. 4"]. *See* Trial Tr. 92:13–21, Sept. 15, 2025 (excerpt), ECF No., 181 ["Trial Tr. Vol. 1"].

[2] Trial Tr. 56:9–12, Sept. 15, 2025, ECF No. 156 ["Trial Tr. Vol. 2"].

[3] *See* Pl.'s Ex. 19.

[4] Trial Tr. Vol. 1, 104:7–9.

[5] *See* Pl.'s Ex. 39; Defs.' Ex. 19; Trial Tr. 39:18–23, Sept. 17, 2025, ECF No. 184 ["Trial Tr. Vol. 6"].

[6] *See* Pl.'s Ex. 39; Defs.' Ex. 19.

[7] Pl.'s Ex. 39; Defs.' Ex. 19; Trial Tr. Vol. 6, 40:1–41:21.

[8] Trial Tr. Vol. 6, 41:3–21; Pl.'s Ex. 111; Pl.'s Ex. 19.

[9] Trial Tr. Vol. 6, 41:13–16.

[10] *Id.* 41:13–16. *See also* Pl.'s Ex. 39; Defs.' Ex. 19 (explaining to Bennett she believed other students had been permitted to bank hours in the past).

After Campbell discussed her discrimination concerns, Reilly informed Campbell via email that "OED can initiate a conversation with Dr. Bennett to make sure he and other professors understand and adhere to what is required under the applicable policies and under Title IX."[11] She explained that she "can contact Dr. Bennett directly and schedule a call" and "reassure[d] [Campbell] again that in all conversations of this nature [OED] address[es] and underscore[s] the university's non-retaliation policy and . . . tr[ies] to be very sensitive to the ongoing nature of relationships/interactions."[12] Reilly stated that she "would prefer that [OED] reach out directly to Dr. Bennett[,]" as doing so would be "in line with [OED's] typical process."[13]

Campbell gave Reilly permission to contact Bennett,[14] but asked her not to relay her discrimination complaint to him out of fear that doing so would "make [it] worse."[15] The next day, Reilly told Campbell that she had reached out to Bennett to schedule a call.[16] Bennett and Reilly met regarding Campbell's visit to OED.[17]

After meeting with Bennett, Reilly sent an email to Bennett and Campbell "to memorialize the conversations that [she] had with each of [them] regarding

---

[11] Pl.'s Ex. 111; Trial Tr. Vol. 6, 45:19–23. Defense counsel objected to "anything Ms. Reilly wrote back" to Campbell as hearsay. *See id.* 44:10–14. We overruled the objection. *See id.*

[12] Pl.'s Ex. 111; Trial Tr. Vol. 6, 44:24–45:7.

[13] Pl.'s Ex. 111; Trial Tr. Vol. 6, 46:4–8.

[14] Pl.'s Ex. 111; Trial Tr. Vol. 6, 47:15–16.

[15] Pl.'s Ex. 111; Trial Tr. Vol. 6, 41:17–20; Trial Tr. 76:2–15, Sept. 18, 2025, ECF No. 185 ["Trial Tr. Vol. 7"] ("I was afraid of how [the discrimination complaint] might be perceived or if there would be backlash from it. [Reilly] assured me that there was a no retaliation policy, and I asked her if she could refrain from bringing up my concerns of the difference of treatments because I didn't want to offend anybody or make waves.").

[16] Pl.'s Ex. 111; Trial Tr. Vol. 6, 48:8–9.

[17] Trial Tr. Vol. 1, 120:6–22.

accommodations and expectations surrounding [Campbell's] anticipated maternity leave[.]"[18] The email does not mention a discrimination complaint.

Campbell contends that Cohen and Bennett began subjecting her to antagonistic behavior the day after Reilly spoke to Bennett about Campbell's OED visit.[19] On March 11, 2022, Cohen advised Campbell to address her as "Dr. Cohen" rather than "Cohen."[20] Days later, Bennett raised the same issue with Campbell, asking her to call him "Dr. Bennett" as required by Drexel policy to address faculty members by their appropriate titles.[21] Neither Cohen nor Bennett had previously critiqued Campbell's means of addressing them.[22] Cohen testified that she and Bennett had been aware of the issue for some time prior to bringing it up with Campbell,[23] for the first time, after her OED complaint.[24]

Under the CRNA program's policy, a student can be issued a "clinical alert" or a "clinical warning," placed on clinical probation, or be dismissed immediately for "unsafe practice."[25] There is no limit to how many clinical alerts a student may receive. A student may receive only two clinical warnings or be placed on probation once during the

[18] *See* Pl.'s Ex. 19.

[19] *See* Pl. Rebecca Campbell's Br. in Opp'n to Defs.' Mot. for J. as a Matter of L. or, in the Alternative, Mot. for New Tr. or Remittitur ["Pl.'s Opp'n"] at 22 n.10, ECF No. 214.

[20] *See* Defs.' Ex. 20; Pl.'s Ex. 49.

[21] Trial Tr. Vol. 1, 122:3–25; Defs.' Ex. 10 at 17 ("Always address the faculty member by his or her title: Professor or Doctor.").

[22] Trial Tr. Vol. 6, 52:3–18, 53:4–10.

[23] Trial Tr. 99:21–101:13, Sept. 16, 2025, ECF No. 182 ["Trial Tr. Vol. 3"].

[24] Trial Tr. Vol. 6, 52:3–18, 53:4–10.

[25] *See* Defs.' Ex. 10 at 92–96; Trial Tr. Vol. 3, 49:13–51:1.

program.[26] If exceeded, the student will be dismissed.[27] By contrast, a student may be dismissed immediately for a single "unsafe practice," which is defined, in part, as "[a]n act or behavior which threatens or has the potential to threaten the physical, emotional, mental or environmental safety of the patient, a family member or substitute familial person, another student, a faculty member or other health care provider."[28] Whether conduct warranted a clinical alert, clinical warning, or probation, and what was an "unsafe practice," were at Cohen's and Bennett's discretion.[29]

On April 26, 2022, Cohen and Bennett issued Campbell a clinical warning, her first, based on two negative performance evaluations provided by her ASPA preceptors at Christiana, a pharmacy audit report revealing Campbell made numerous errors regarding narcotic-handling requirements, and issues regarding her care plans.[30] The first performance evaluation was an April 12, 2022 evaluation from CRNA preceptor Barb Evans, who documented six areas where Campbell "need[ed] improvement."[31] The evaluation reported that she failed to conduct a preoperative anesthesia evaluation and airway assessment prior to the patient's arrival to the operating room, did not provide a written care plan, and needed reminders to monitor the patient's blood pressure and watch for hypotension.[32] The second evaluation, prepared by CRNA Marshall Colbert on

[26] *See* Defs.' Ex. 10 at 93–94; Trial Tr. Vol. 3, 49:13–50:7.

[27] *See* Defs.' Ex. 10 at 93–94; Trial Tr. Vol. 3, 49:13–50:7.

[28] *See* Defs.' Ex. 10 at 96; Trial Tr. Vol. 3, 49:13–51:12, 52:4–6.

[29] Trial Tr. Vol. 3, 49:13–51:12, 52:4–6.

[30] Defs.' Ex. 31. "Care plans" are documents students prepared detailing the anesthetic treatment they anticipated using for patients based on the patients' scheduled procedures. *See* Trial Tr. Vol. 3, 17:13–21; Trial Tr. Vol. 6, 24:9–25:10.

[31] *See* Pl.'s Ex. 54; Defs.' Ex. 31.

[32] *See* Pl.'s Ex. 54.; Trial Tr. 24:24–29:10, Sept. 17, 2025, ECF No. 160 ["Trial Tr. Vol. 5"].

April 14, 2022 and forwarded to Cohen by CRNA preceptor Mark Loftus, listed four "needs improvement" areas and stated that Campbell was lacking a care plan, had a deficit in case knowledge, "appear[ed] apathetic to cardiac anesthesia," and labeled a medication pump incorrectly.[33]

When she met with Cohen and Bennett to discuss the evaluations, Campbell explained away the errors. For example, she stated that she had assessed the airway and monitored the blood pressure for the patient she treated with Evans on April 12, but had not told Evans she had done so at the time because she had been suffering from gestational laryngitis.[34] She also told Bennett and Cohen that the incorrectly labeled pump documented in the April 18 evaluation referred to an instance where the physician handed her the wrong medication to hang on the pump, but Campbell noticed the error and removed the medication before it reached the patient.[35] Campbell noted that Evans had given her positive evaluations in the days following her negative review and explained that she had exhibited improvement.[36] At the end of the meeting, Cohen and Bennett issued Campbell a clinical warning.[37]

On May 10, 2022, Campbell left early for a sonogram appointment.[38] Tara Hafycz, one of her clinical coordinators at Christiana,[39] had given her permission to do so.[40] But

---

[33] *See* Pl.'s Ex. 52, Defs.' Ex. 31.

[34] *Id.* 66:20–67:14, 129:12–15.

[35] *See id.* 68:12–69:25; Trial Tr. Vol. 4, 21:15–25.

[36] Trial Tr. Vol. 6, 61:20–66:15; Pl.'s Ex. 51; Pl.'s Ex. 53. *See also* Trial Tr. Vol. 4, 24:3–15.

[37] Trial Tr. Vol. 6, 81:14–24; Defs.' Ex. 31.

[38] *See* Trial Tr. Vol. 6, 89:17–93:8; Pl.'s Ex. 58.

[39] Hafycz, an ASPA employee, acted as clinical coordinator for Drexel. *See* Trial Tr. Vol. 4, 71:15–72:7.

[40] *See* Trial Tr. Vol. 6, 89:17–93:8; Pl.'s Ex. 58 ("Can you email scheduling with me attached and ask for early out for an appointment and I'll ok it and then [you are] good.").

Hafycz informed Cohen and Bennett in an email that she had not given Campbell permission to leave early, and instead had instructed her to ask Cohen for permission.[41] Cohen forwarded Hafycz's email to Bennett, noting Campbell had "never contacted [her] as far as [she] remember[ed]," and asked for his thoughts.[42] Bennett responded, "Add it to her list!!"[43] Cohen subsequently emailed Campbell, stating she was aware Campbell had not done what Hafycz had asked, and instructing Campbell to inform her directly prior to early departures in the future.[44]

On July 14, 2022, in response to learning that she had been diagnosed with gestational diabetes, Campbell informed her CRNA preceptor Mark Loftus that her doctor required her to check her blood sugar at specific times and chart her blood glucose and food intake on her phone.[45] Loftus gave her permission to use her phone to log her blood sugar and food intake.[46] He did not set any limitations on when or where she could use her phone for that purpose.[47]

Loftus discussed Campbell's performance that day with Cohen and Hafycz.[48] He reported that when he arrived at the operating room that morning, Campbell "appeared tearful," and shared with him that she "had received news that she had health issues."[49] Loftus explained that he had asked Campbell if she wanted to go home, and she

---

[41] *See* Pl.'s Ex. 69.

[42] *See id.*

[43] *See id.*

[44] *See* Trial Tr. Vol. 6, 92:24–93:5.

[45] *See id.* 93:14–94:19.

[46] *See id.*

[47] *See id.* 95:4–6.

[48] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38.

[49] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38.

responded that she would stay.[50] He stated that in their first case that day, she was on her phone "at multiple times during the case" and at one point he had to cue her to a patient's "bucking" even after the surgeons verbalized it.[51] Loftus stated that, at that point in the surgery, Campbell had appeared "disengaged and preoccupied[.]"[52]

Loftus also reported to Cohen and Hafycz that Campbell had "continued to check her phone" while managing their second case.[53] He described how, at one point during the procedure, he stepped out to retrieve narcotics for the patient.[54] After he returned, he told Campbell he "felt it was in her best interest to leave clinical for the day" as she "appeared disengaged and her mind was elsewhere."[55] Campbell chose to stay, and Loftus told her to take a break.[56] When Campbell stepped out, the operating room circulator reported that Campbell "appeared disconnected" and had been "using her phone the entire time" Loftus had left to retrieve narcotics.[57] Loftus reported that, after Campbell returned from break, she "continued to use her cell phone during the cases" that day.[58] He noted that he had critiqued her treatment on their final case, and told her to take a break again.[59] He concluded his report by warning that he had "concern for

[50] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38.

[51] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38. "Bucking" is a relatively common occurrence where a patient moves while under anesthesia. *See* Trial. Tr. Vol. 2, 53:23–25. In response, the patient may be given a deeper anesthetic. *See* Trial Tr. Vol. 6, 96:1–2.

[52] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38.

[53] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38.

[54] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38.

[55] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38.

[56] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38.

[57] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38.

[58] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38.

[59] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38.

patient safety if [Campbell] continues to balance clinical stress along with health concerns."[60]

After receiving Loftus's report, Cohen sent an email to the entire student body discussing proper phone use, and privately invited Campbell to discuss what Loftus had reported.[61] At the meeting, Campbell informed Bennett and Cohen that she had used her phone with permission from Loftus.[62] Cohen and Bennett issued Campbell a clinical alert in response to the incident.[63]

A medication error that occurred on July 28, 2022 led to Campbell's dismissal from the program.[64] She had been monitoring a patient before "handing off" the patient to a CRNA.[65] Sometime after the hand-off, the CRNA discovered that the lidocaine and magnesium infusion wires had been switched, so that each was being infused to the patient at the wrong rate.[66] The error was rectified before the patient suffered harm.[67]

On August 1, after learning about the medication error, Cohen emailed Hafycz.[68] She asked, "from a clinical site standpoint, can [Campbell] continue at [the Christiana] site with 2 known/documented medication errors?"[69]

---

[60] Trial Tr. Vol. 2, 40:15–42:17, 45:7–14; Defs.' Ex. 38.

[61] *See* Trial Tr. Vol. 6, 98:4–7.

[62] *See id.* 98:18–99:8. At trial, Bennett conceded that using a cell phone for medical purposes with permission does not violate Drexel policy. Trial Tr. Vol. 1, 154:19–22.

[63] *Id.* 99:1–8; Defs.' Ex. 39.

[64] Trial Tr. Vol. 3, 35:24–36:14; Defs.' Ex. 46.

[65] *See* Trial Tr. Vol. 6, 102:11–103:25. A "hand-off" is the process by which a nurse finishing their shift will explain to the nurse taking over the patient's care what phase of their procedure the patient is in, what medications are being infused, and other pertinent information. *See id.*

[66] Trial Tr. Vol. 4, 35:15–24; Defs.' Ex. 43.

[67] *See* Trial Tr. Vol. 6, 104:12–105:16; Trial Tr. Vol. 3, 133:4–15.

[68] Pl.'s Ex. 121.

[69] Pl.'s Ex. 121.

On August 3, Loftus informed Cohen that he, Hafycz, and ASPA clinical coordinator Loudena Lavender wanted Campbell "removed from the Christiana clinical site" because they "fe[lt] that patient safety [would be] at risk if [Campbell] were to continue clinicals at Christiana."[70] Six days later, Cohen and Bennett dismissed Campbell from the CRNA program.[71] Bennett testified that the July 28 medication error warranted immediate dismissal under Drexel's one-strike "unsafe practice" policy.[72] Campbell's official dismissal letter states that the dismissal was based on "repeated documented errors made by [Campbell] in the clinical setting," but the July 28 error is the only one specified.[73]

At the time of her dismissal, Campbell had been issued only one clinical warning and one clinical alert.[74] She was the only student ever dismissed from the CRNA program.[75]

Campbell sued Drexel, ASPA, Christiana, Bennett, Cohen, and Hafycz for sex-based discrimination.[76] She also brought retaliation claims against Drexel, Bennett, Cohen, and Hafycz, alleging she was dismissed from the CRNA program for complaining she had been denied the scheduling accommodation on the basis of her sex.[77] Her claims against ASPA and Christiana were dismissed prior to trial.[78]

---

[70] Trial Tr. Vol. 2, 26:11–24, 44:6–45:3, 55:25–56:12.

[71] *See* Defs.' Ex. 46.

[72] Bennett testified that the July 28 incident is "the ultimate unsafe practice" for which Campbell was dismissed under the "unsafe practice" policy. Trial Tr. Vol. 3, 35:24–36:14. *See also* Defs.' Ex. 46.

[73] *See* Defs.' Ex. 46.

[74] Trial Tr. Vol. 3, 50:14–18; Defs.' Ex. 31; Defs.' Ex. 39.

[75] Trial Tr. Vol. 1,162:24–163:1.

[76] *See generally* Compl.

[77] Compl. ¶¶ 320–25.

[78] Campbell's claims against Christiana and ASPA were dismissed on a motion to dismiss and motion for summary judgment, respectively. *See* Order dated April 30, 2024, ECF No. 29; Order dated June 3, 2025, ECF No. 78.

After a four-day trial,[79] the jury found Bennett and Cohen liable for retaliation under the Pennsylvania Human Relations Act ("PHRA") and the Pennsylvania Fair Educational Opportunities Act ("PFEOA").[80] It awarded Campbell $2,950,000.00 in damages.[81]

**Analysis**

Motion for JNOV

Bennett and Cohen now move for judgment notwithstanding the verdict ("JNOV"). They argue that Campbell did not prove her case because she failed to establish causation.[82]

To succeed on her retaliation claim, Campbell had to prove: (1) she engaged in "protected activity" under the PHRA and PFEOA; (2) Cohen and Bennett took an adverse action against her; and (3) there was a causal link between the protected activity and the adverse action. *See Slagle v. Cnty. of Clarion*, 435 F.3d 262, 265 (3d Cir. 2006).

The parties do not dispute that Campbell complained of sex discrimination to Drexel's Office of Equality and Diversity ("OED").[83] Nor do they dispute that her complaint

[79] The trial was bifurcated. The liability phase took place from September 15 to September 18, 2025. *See* Trial Tr. Vol. 1, at 1; Trial Tr. Vol. 7, at 1.

[80] *See* Verdict, ECF No. 135; Compl. ¶ 322 (alleging Campbell complained to Drexel's Office of Equality and Diversity about "the more favorable terms and accommodations Drexel offered to males seeking parental leave").

[81] The jury awarded Campbell $200,000 in compensatory damages, $250,000 in past wages, and $2,500,000 in future wages. *See* Damages Verdict, ECF No. 174.

[82] *See* Defs.' Mem. in Supp. of Mot. for J. as a Matter of L. or, in the Alternative, Mot. for New Tr. or Remittitur ["Defs.' JNOV Br."] 10–29, ECF No. 210.

[83] *See* Defs. Lewis Bennett and Ferne Cohen's Mem. Addressing the Questions Identified in the Court's July 8, 2026 Order ["Defs.' Br. on Jury Instruction Error"] 2, ECF No. 222 ("The question is not whether Ms. Campbell privately complained to OED about discrimination. She did.").

was protected activity.[84] They dispute whether she established a causal link between her OED complaint and her dismissal from the CRNA program.[85]

To establish causation, Campbell had to prove Cohen and Bennett knew about her protected activity. *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 197 (3d Cir. 2015); *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493–94 (3d Cir. 2002) (holding in First Amendment retaliation case that if decisionmakers were "unaware" of the protected speech, "it could not possibly have been a substantial or motivating factor" in the adverse employment decision).

As we explain later, temporal proximity of the protected activity and the adverse action can, but does not necessarily, establish a causal link. But, it does not establish knowledge itself. *See Daniels*, 776 F.3d ("[T]he temporal proximity of adverse action to protected conduct does not establish that the adverse actor had knowledge of the protected conduct before acting."); *Kacian v. Postmaster Gen. of the U.S.*, 653 Fed. App'x 125, 130 (3d Cir. 2016); *Walsh v. Wal-Mart Stores, Inc.*, 200 Fed. App'x 134, 136 (3d Cir. 2006).

Defendants argue Campbell failed to establish Bennett and Cohen knew she complained about discrimination.[86] Knowledge can be established through circumstantial evidence. *See Kacian*, 653 Fed. App'x at 130. Viewed in the light most favorable to Campbell, there was enough circumstantial evidence for the jury to reasonably infer Bennett and Cohen knew about her protected activity.

---

[84] *See id.* ("A complaint of pregnancy discrimination is protected activity.").

[85] Defs.' JNOV Br. 10–29.

[86] As Bennett and Cohen argue, the issue is not whether Campbell complained of discrimination to OED. Bennett and Cohen concede that she did. *See* Defs.' Br. on Jury Instruction Error 2. The issue is whether they knew about it at the time. *See id.*

It was not enough to show that Bennett and Cohen knew Campbell went to OED. Campbell had to prove they knew she complained to OED about sex discrimination.

There was sufficient evidence from which the jury could have reasonably inferred Reilly told Bennett about Campbell's discrimination complaint. Reilly explained to Campbell that it would be "in line with [OED's] typical process" to "initiate a conversation with Dr. Bennett" regarding "applicable policies and under Title IX" after Campbell reported discrimination. Indeed, Reilly specified that in such conversations, OED "address[es] and underscore[s] the university's non-retaliation policy[.]" Although Campbell asked Reilly not to relay her discrimination complaint to Bennett out of fear that doing so would "make [it] worse," Reilly never indicated she would honor that request.

Defendants cite Reilly's March 10 email to Bennett and Campbell summarizing her discussion with Bennett, which mentions only accommodations and does not mention Campbell's discrimination complaint.[87] They argue that omission, coupled with Campbell's request for Reilly to withhold discussion of her discrimination concerns, show that Reilly did not relay the complaint to Benentt.[88]

We disagree. The jury could have inferred that, despite Campbell's request to keep her discrimination concerns confidential, Reilly discussed them with Bennett. She was Director of Equal Opportunity and Title IX Compliance. It was her job to respond to Campbell's complaint and rectify any discrimination. She could do that only by investigating and discussing it with the subject of the complaint. She explained to

---

[87] *See* Defs.' JNOV Br. 14.

[88] *See id.* 14–15; Defs.' Br. on Jury Instruction Error 2.

Campbell that it was standard protocol to discuss a student's discrimination complaint with faculty. She never assured Campbell she would treat her complaint any differently.

That Bennett was the subject of Campbell's complaint is enough to raise the inference that he knew about it.[89] *See Daniels*, 776 F.3d at 197 (noting that "a factfinder potentially could infer" that defendants knew about plaintiff's protected activity because it "contained specific allegations against them"); *Kacian*, 653 Fed. App'x 125 at 130 ("[A] factfinder could reasonably infer that [the adverse actor] knew about the complaint as . . . it involved specific allegations against him."). This is further supported by Reilly's email stating that typical OED practice is to reach out to Bennett to "make sure he and other professors understand and adhere to what is required under the applicable policies[.]"[90] That statement could reasonably be perceived as Reilly's explaining what she intended to do. This evidence is enough for the jury to conclude that Reilly relayed Campbell's complaint to Bennett.

There was also evidence for the jury to infer Cohen knew that Campbell had complained to OED. Bennett was chair of the CRNA program and Cohen was chair of its clinical component.[91] Their offices were across the hall from each other,[92] and they regularly communicated.[93] For example, when asked about her instructing Campbell to

---

[89] Campbell testified that her complaint included allegations against Bennett specifically. *See* Trial Tr. Vol. 6, 116:12–15. (testifying that Bennett had motive to retaliate against her because she "filed a complaint against him for discrimination with OED").

[90] Pl.'s Ex. 111; Trial Tr. Vol. 6, 45:19–23.

[91] Trial Tr. Vol. 1, 104:7–9; Trial Tr. Vol. 3, 59:1–7.

[92] Trial Tr. Vol. 1, 104:10–18.

[93] Trial Tr. Vol. 3, 60:2–4.

address her in a professional manner, Cohen confirmed that she and Bennett had discussed the issue together.[94]

Campbell's request to bank hours would fall under Cohen's supervision of clinical requirements. Campbell's complaint was related to her participation in clinical and directly affected how that component was being administered. One could infer that Campbell's claiming she was treated differently than other students in the clinical program would have been discussed with the person in charge.

None of these facts, standing alone, establishes knowledge. But, taken together, they give rise to an inference that Cohen learned of Campbell's OED complaint, either through Bennett or Reilly.

Once knowledge is established, a plaintiff must show a causal link between the protected activity and the adverse action. A causal link can be established by either temporal proximity between the protected activity and the adverse action that is "unusually suggestive" of retaliatory animus, or a "pattern of antagonism" coupled with timing sufficient to raise the inference. *Lynn v. Bank of N.Y. Mellon*, 180 F.4th 133, 144 (3d Cir. 2026). Absent "unusually suggestive" temporal proximity or a pattern of antagonism, "we consider the circumstances as a whole," including "any other evidence suggesting that the [adverse actor] had a retaliatory animus when taking the adverse action." *Steidle v. U.S. Liab. Ins. Co.*, 179 F.4th 193, 209 (3d Cir. 2026); *Lynn*, 180 F.4th at 145–46; *Kacian*, 653 F. App'x at 129 (finding the "totality of the evidence support[ed] an inference of causation").

[94] *Id.* 99:21–101:13.

Campbell was dismissed from the CRNA program five months after making her complaint.[95] That alone is not enough to establish causation. *See Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 221 (3d Cir. 2017) (finding the "unusually suggestive" inference begins to dissipate after three months). The greater the time between the complaint and the adverse action, the less it tends to show a causal link. But, a delay of several months does not preclude a link. A savvy university could patiently build a case against a student to justify a dismissal that had been preordained when the protected activity became known.

Campbell contends she demonstrated she was subjected to a pattern of antagonism that began when Cohen critiqued her "Cohen" salutation the day after Reilly spoke to Bennett, and continued just days later when Bennett addressed the same issue.[96] She argues their retaliatory animus was also evident the following month when Cohen and Bennett opted to issue her a clinical warning "on unconvincing grounds."[97] Next came Bennett and Cohen's reactions to learning she had left clinical early, and their issuing her a clinical alert for using her cell phone in the operating room despite having permission to do both.[98] Finally, she was blamed for the July 28, 2022 medication error, and Cohen and Bennett deemed the error an "unsafe practice" to use it as a reason to dismiss her under Drexel's one-strike policy.[99] Campbell contends the decision to dismiss

---

[95] Campbell first complained to OED on March 1, 2022. *See* Pl.'s Ex. 111; Trial Tr. Vol. 6, 41:3–21. She was dismissed from the CRNA program on August 9, 2022. *See* Defs.' Ex. 46.

[96] *See* Pl.'s Opp'n 30.

[97] *See* Pl.'s Opp'n 30–31.

[98] *See* Pl.'s Opp'n 31.

[99] *See* Pl.'s Opp'n 31–32.

her rather than continue applying progressive steps further reveals their retaliatory animus.[100]

Some of the evidence Campbell argues constitutes retaliatory instances of "antagonism" cannot reasonably be taken as such. For example, the clinical warning and the clinical alert were based on evaluations and accounts Cohen and Bennett received from ASPA personnel, none of whom knew about Campbell's discrimination complaint.[101] *See Lynn*, 180 F.4th at 146 (noting the defendant's criticisms of the plaintiff's performance did not point to a pattern of antagonism because they "were all based on negative feedback [the plaintiff] received from multiple employees, including those who had never heard about [the plaintiff's protected activity]").

That Campbell's first-ever alert and warning came after her OED visit is also not probative of animus because there is no evidence that Cohen and Bennett ever had reason to alert or warn her before, but did not. Campbell testified that the negative evaluations from preceptors Evans and Loftus in April 2022 were the first evaluations she had ever received from a preceptor indicating her performance "need[ed] improvement."[102] Critically, Campbell never established that the warning and the alert constituted a more extreme response than other students received for similar conduct.[103]

[100] *See* Pl.'s Opp'n 32–34.

[101] There was no evidence that either Evans or Colbert knew Campbell had complained about discrimination.

[102] *See* Trial Tr. Vol. 6, 29:24–30:13.

[103] Campbell testified that the "needs improvement" evaluations from Evans and Loftus were "handled different[ly]" from how other students were treated under the same circumstances. *See id.* 137:15–20. But, Campbell never established how Bennett and Cohen's response was "different" from how other students were treated in response to similar evaluations. She did not establish, for example, that other students would not have received a warning in response to receiving ten total "needs improvement" notations from two preceptors within a single week, or an alert for a preceptor reporting they had been distracted by their phone during surgery.

Cohen and Bennet cannot be considered "antagonistic" for doing their job in response to Campbell's reported errors.

The two instances where Campbell claims she was antagonistically reprimanded for pre-approved conduct cannot reasonably be considered evidence of retaliatory animus. Regarding the phone use for which she received a clinical alert, Campbell had permission to use her phone. But, Cohen and Bennett did not issue her an alert merely because she used her phone or because she used it during a patient's surgery. The alert, like the clinical warning, was based on an ASPA preceptor's account of Campbell's clinical performance. It was not conjured up by Cohen and Bennett. Loftus complained to Cohen that Campbell had been on her phone "multiple times during [a] case," and was so "disengaged and preoccupied" that he had to alert her when the patient began moving during surgery.[104] Bennett and Cohen had no reason to believe the account was not accurate. Indeed, when Campbell met with them to discuss the incident, she did not deny that she had been on her phone when the patient was "bucking" or that she had to be alerted to the patient's movement.[105] She merely explained Loftus had given her permission to use her phone to log her medical information, and that using her phone "for medical reasons with permission" was not in violation of school policy.[106] There was no evidence that Cohen and Bennett did not give alerts or warnings to other students whose preceptors reported information similar to what Loftus has relayed about Campbell.

[104] The clinical alert explains that "[t]he use of a cell phone is a patient safety issue, as distractions minimize vigilance and increase[] the risk for an adverse patient outcome[.]" Defs.' Ex. 39.

[105] *See* Trial Tr. Vol. 6, 98:13–99:8.

[106] *See id.* 98:13–99:8.

Nor can Cohen's response to Campbell's early departure for her sonogram appointment be construed as antagonism. Hafycz told Cohen that Campbell had left without permission. So Cohen told Campbell to let her know in the future if she would be leaving early. Given what Hafycz told her, it was not "antagonistic" to remind Campbell of school policy regarding early departure.[107]

Although the warning, the alert, and Cohen's response to Campbell's early departure cannot reasonably be considered antagonism, the jury could have considered other interactions indicative of animus. Beginning with Cohen and Bennett's instructing Campbell to refer to them by their professional titles as required by school policy, that was not antagonistic on its face. Notably, Cohen's feedback was not out of the blue. Her observation that Campbell applied "an inconsistent use of proper salutation in [her] emails" was sent in response to an email Campbell sent her the previous evening with the salutation "Cohen,".[108] Earlier that day, Campbell had sent an email in the same chain beginning with, "Doctor Cohen,".[109] That Cohen would use that opportunity to address the issue is not, on its face, indicative of animus.[110] Nor was it antagonistic of Bennett, who had discussed the issue with Cohen,[111] to remind Campbell that school policy required use of professional honorifics.[112]

---

[107] Campbell was a student. Cohen and Bennett were her professors. We will not categorize an instance where an instructor corrects a student or reminds them of school policy as "antagonistic" solely because it occurs after the student engages in protected activity.

[108] *See* Defs.' Ex. 20 (explaining that "[s]ome [of Campbell's] emails address [her] as Dr Cohen and other emails, just Cohen," and requesting that Campbell "please check future emails prior to sending.").

[109] *See* Defs.' Ex. 20.

[110] *See* Defs.' Ex. 20.

[111] Trial Tr. Vol. 3, 100:12–23.

[112] Defs.' Ex. 10 at 17.

But, the timing of the admonishment raises an inference of antagonism. Cohen's email came the day after Reilly discussed Campbell's OED complaint with Bennett. Bennett's feedback came just a few days later. And, unlike other conduct Cohen and Bennett critiqued, Campbell's tendency to address them by their last names predated the OED complaint. Therefore, the jury could have reasonably inferred that Cohen and Bennett's raising the issue for the first time just days after Campbell had complained to OED was evidence of antagonism triggered by that complaint.

Cohen's email addressing salutations included critical feedback on Campbell's care plans.[113] Unlike the clinical warning and the clinical alert, her feedback was not based on a third party's account of Campbell's performance. Campbell's care plans regularly received high marks, with no criticism or suggested changes from Cohen.[114] Cohen had previously sent out Campbell's self-made care plan templates for the entire student body to use as a template for their own work.[115] Cohen's feedback in the March 11 email was the first criticism Campbell had ever received from Cohen.[116] An instructor's critiquing a student's work is not antagonistic. But, when it is unprecedented criticism coming the day after the student engaged in protected activity, the jury can see it as circumstantial evidence of animus.

Campbell also points to the August 1, 2022 email Cohen sent Hafycz after she learned about the July 28 medication error as evidence that it was Cohen who "solicited from Christiana/ASPA the idea that Ms. Campbell could no longer remain at the Christiana

---

[113] *See* Pl.'s Ex. 49; Defs.' Ex. 20.

[114] Trial Tr. Vol. 6, 25:21–24, 54:2–7.

[115] *Id.* 25:16–24.

[116] *Id.* 54:16–55:2.

clinical site."[117] In the email, Cohen asked if Campbell can remain at the Christiana site despite her having "2 known/documented medication errors?"[118] Loftus testified that the decision to remove Campbell from Christiana was a unilateral ASPA decision.[119] But, looking at it most favorably to Campbell, Cohen's raising the issue of dismissal could be considered her soliciting a reason to let Campbell go.

Bennett's "Add it to her list!!" comment could also be considered evidence of retaliatory animus for similar reasons. The jury could take it as evidence that Cohen and Bennett were targeting her and building a case to justify her dismissal.

The most compelling evidence of retaliatory animus is Cohen and Bennett's dismissing Campbell for the July 28, 2022 medication error. Campbell was not the first student to make medication errors. But she was the only one ever dismissed for doing so. Past students had received clinical alerts and clinical warnings for administering incorrect medications and incorrect doses.[120] One student who had incorrectly administered ten times the prescribed dose of fentanyl to a three-year-old patient was given an alert.[121] Another, who incorrectly administered insulin, which Cohen conceded "could have resulted in significant patient harm," received a warning.[122] A "distracted" student who required "too many reminders" to document information in a patient's chart

---

[117] *See* Pl.'s Opp'n 32–33.

[118] *See* Pl.'s Ex. 121.

[119] *See* Trial Tr. Vol. 2, 26:4–10.

[120] *See* Trial Tr. Vol. 3, 60:5–90:6.

[121] *Id.* 83:5–24.

[122] *Id.* 87:13–88:18.

and administered the wrong dose of medication received an alert.[123] Another received an alert for administering medication without having been directed to do so.[124]

Rather than issuing Campbell an alert or a warning, or placing her on probation, Cohen and Bennett opted for the most severe option, dismiss her for a single "unsafe practice" error.[125] Notably, it is Bennett and Cohen who decide what constitutes "unsafe practice."[126]

Because Campbell was the only student ever to be dismissed from the program, she was necessarily the only student to whom the "unsafe practice" policy had ever been applied. Given the comparator evidence of past students' errors and the disparity of treatment between them and Campbell, together with the other evidence, the jury could reasonably find Cohen and Bennett's decision to apply the one-strike policy to Campbell was the product of retaliatory animus.[127]

In summary, the evidence of retaliatory animus consists of Cohen and Bennett's early March "call me Doctor" comments; Cohen's March 11 first-time critique of Campbell's care plan; Bennett's May 11 "Add it to her list" comment; Cohen's August 1 inquiry about whether Campbell could remain at Christiana; and Cohen and Bennett's

---

[123] *See* Trial Tr. Vol. 3., 84:4–85:1.

[124] *See id.* 88:19–89:6.

[125] *See* Defs.' Ex. 46.

[126] Trial Tr. Vol. 3, 50:23–51:12, 52:4–6.

[127] In the damages phase of trial, Cohen and Bennett argued that Campbell's dismissal cannot be attributed to them because, pursuant to Drexel's contracts with its clinical sites, they had no choice but to dismiss her once she had been dismissed from a clinical site for patient safety issues. *See* Trial Tr. 29:16–20 ("[The testimony said that their contracts . . . prohibited them from sending someone to a different site who had been dismissed for clinical safety reasons, and there's no dispute in this litigation that [Campbell was] dismissed for clinical safety reasons."), 54:7–13, Oct. 22, 2025, ECF No. 188. They made this argument for the first time in the damages phase. But, during the liability phase, Cohen and Bennett each testified that they had discussed whether to place Campbell at another clinical site, and they determined it was in the best interest of patient safety not to do so. *See* Trial Tr. Vol. 1, 165:5–11; Trial Tr. Vol. 4, 46:15–47:20.

decision to apply the one-strike "unsafe practice" policy, for the first time, to Campbell based on the July 28 medication error, which the jury could reasonably have found was not more grievous than errors committed by other students who were not dismissed.

Combined with the prior instances of animus, however slight, the severity of Cohen and Bennett's unprecedented and irreversible decision to dismiss Campbell despite having other options gave the jury a reasonable basis to find that her dismissal was caused by retaliatory animus instigated by her discrimination complaint to OED. Therefore, we will deny the defendants' motion for JNOV.

Erroneous Jury Instruction

The jury instructions on the retaliation claim were incorrect. The jury was properly instructed that Campbell had to prove she engaged in protected activity. But, the instructions improperly described the protected activity as "request[ing] an accommodation due to her pregnancy."[128] The jury was further instructed that Campbell had to prove a causal connection between the adverse action and "her informing Drexel of her pregnancy and her request for information concerning maternity leave and other accommodations."[129]

Merely requesting a pregnancy-related accommodation and information on maternity leave is not protected activity under the PHRA or PFEOA.[130] "Protected activity"

---

[128] Trial Tr. Vol. 7, 153:4–11.

[129] *Id.* 153:15–18.

[130] We held oral argument on the jury instruction issue, and the parties submitted supporting briefs beforehand. In both their briefing and in oral argument, they agreed that requesting an accommodation is not protected activity. *See* Pl.'s Br. on Jury Instruction Error 4 ("[O]n its face, an instruction implying that seeking an accommodation alone was protected activity would be erroneous[.]"); Defs.' Br. on Jury Instruction Issue 1 ("A request for a pregnancy-related accommodation, standing alone, is not protected activity."). Campbell's position at the hearing varies from her initial opposition to the defendants' motion for JNOV, where she argues that Campbell's accommodation request alone is protected activity at issue. *See* Pl.'s Opp'n. 28 n.15. But, even there, she argues that the protected activity at issue was Campbell's

is opposition to unlawful conduct—in this case, sex discrimination. *See Malakoski v. Garland*, No. 25-1521, 2026 WL 595854, at *1 n.3 (3d Cir. Mar. 3, 2026).[131]

To prove Bennett and Cohen retaliated against her, Campbell had to prove they dismissed her because she had complained she was being discriminated against.[132] But, the jury was instructed she had to prove Cohen and Bennett dismissed her because she had asked for a scheduling accommodation related to her pregnancy and information about maternity leave.[133] It was not instructed that Campbell had to prove the defendants took an adverse action against her because she complained about sex discrimination.

Rule 59(d) provides we "may grant a timely motion for a new trial for a reason not stated in the motion" if we "giv[e] the parties notice and an opportunity to be heard" and "specify the reasons" for ordering the new trial. After notifying the parties of the error, we held a hearing on whether the jury instructions were erroneous and warrant a new trial.[134] Thus, even though defendants did not cite this error as a basis for a new trial, we may consider whether it warrants one.

---

complaint of sex discrimination, not her request to bank her clinical hours. *See id.* ("It is not the 'request' for maternity leave that is the issue here; it is retaliation for the complaint to OED that is the issue."). We have found no controlling or persuasive authority stating requesting maternity leave or a related accommodation is protected activity under the PHRA or PFEOA.

[131] *Malakoski v. Garland* is a Title VII retaliation case. The Third Circuit generally applies the same analytical framework to PHRA retaliation claims as to Title VII retaliation claims. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 791 n.9 (3d Cir. 2016) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)).

[132] At oral argument, plaintiff's counsel stressed the law has a "broad definition" of "opposition" to perceived unlawful practice, and that instructing the jury that the protected activity had to be a "complaint" would "have been an error because it would have been too narrow." The issue is that the instructions did not instruct the jury to find *any* form of opposition.

[133] Trial Tr. Vol. 7, 153:15–18.

[134] *See* Fed. R. Civ. P. 59(d); *see also* Order dated July 8, 2026, ECF No. 217 (ordering the parties to attend the hearing and identifying the issues to be addressed).

We may order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a)(1)(A), including "error in the court's instructions to the jury." *Middlebrooks v. Teva Pharms. USA, Inc.*, No. 17-412, 2019 WL 438092, at *11 (E.D. Pa. Feb. 4, 2019).[135]

An erroneous jury instruction warrants a new trial if (1) the error is "fundamental and highly prejudicial or if the instructions are such that the jury is without adequate guidance on a fundamental question" and (2) failure to consider the error would result in a miscarriage of justice. *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 612 (3d Cir. 2011) (quoting *Alexander v. Riga*, 208 F.3d 419, 426–27 (3d Cir. 2000)). In other words, when a jury instruction is erroneous, a new trial is warranted unless the error is harmless. *Id.* at 612. An error is harmless if it is "highly probable" that the error did not contribute to the judgment. *Id.*

[135] Campbell argues that the "protected activity" error cannot be basis for new trial because the defendants invited it when they included it in their individual and joint proposed instructions. *See* Pl.'s Mem. Addressing the Issues Raised in the Court's July 8, 2026 Order ["Pl.'s Br. on Jury Instruction Error"] 2–3, 8–11, 17, ECF No. 220; *see also* Drexel's Proposed Jury Instructions, ECF No. 104, at 8 (stating Campbell had to establish a causal connection between a materially adverse action and her "inform[ing] Drexel University's administrators and/or Office of Equal Opportunity and Title IX Compliance of her pregnancy and her request to pre-bank clinical hours by working through breaks"). Campbell's proposed instructions and the parties' joint proposed instructions submitted later included the same error. *See* Plaintiff's Proposed Jury Instructions, ECF No. 96, at 9 (stating Campbell had to establish a causal connection between her dismissal and her "informing Drexel University's administrators and/or Office of Equal Opportunity and Title IX Compliance of her pregnancy and the need for information concerning maternity leave"); Parties' Joint Submission on Proposed Jury Instructions, ECF No. 110, at 12 (stating Campbell had to establish a causal connection between her dismissal and her "informing Drexel University's administrators and/or Office of Equal Opportunity and Title IX Compliance of her pregnancy, the need for information concerning maternity leave and/or the request for certain accommodations"). Thus, the final jury instructions on the retaliation claim conformed with each set of proposed instructions' definition of the alleged protected activity. *See* Trial Tr. Vol. 7, 153:4–154:19. Neither party objected to the explanation of protected activity in the final instructions.

The error does not implicate the invited error doctrine. Cohen and Bennett did not request an erroneous instruction only to argue now they deserve another bite at the apple because the instruction was wrong. They are not raising the issue. We are. That we failed to recognize it prior to submitting the instructions to the jury does not preclude us from addressing it now.

Campbell argues that, "taken as a whole," the instructions required the jury to link her discrimination complaint to her dismissal.[136] The jury was instructed that, "concerning the first element [protected activity], Ms. Campbell need not prove the merits of her accommodation request but only that she was acting under a reasonable good-faith belief that her right to be free from discrimination on the basis of her pregnancy was violated."[137] Campbell argues that, because of that language, whatever protected activity the jury found must have constituted opposition to perceived sex discrimination.[138]

The "good-faith belief" language merely underscores that the protected activity is not defined correctly.[139] Even with the language, the jury was not instructed to find that Campbell complained of sex discrimination. It could have found that she believed she was being discriminated against without finding she communicated that belief to anyone.

The verdict sheet compounded the error. It asked the jury whether Bennett and Cohen retaliated against Campbell "for complaining about discrimination based on her pregnancy and/or requesting information on maternity leave."[140] Thus, the jury could have found that Campbell was dismissed from the CRNA program because she opposed discrimination (protected activity), or asked for information on maternity leave (not protected activity), or both. In other words, the verdict sheet, as did the jury instructions, allowed the jury to find retaliation based on an incorrect definition.

In summary, based on the erroneous jury instructions and misleading verdict sheet,

---

[136] *See* Pl.'s Br. on Jury Instruction Error 16–19.

[137] *See* Trial Tr. Vol. 7, 154:19–23.

[138] *See* Pl.'s Br. on Jury Instruction Error 16–19.

[139] The "good-faith belief" language only makes sense if the protected activity is defined as a form of opposition to perceived discrimination, not an accommodation request.

[140] *See* Verdict, ECF No. 135.

the jury could have determined Cohen and Bennett retaliated against Campbell if there was a causal connection between her request for an accommodation and her dismissal. It was not instructed that, in order to find Cohen and Bennett liable, it had to find Campbell was dismissed because she opposed discrimination.

The error is patently fundamental and prejudicial. Cohen and Bennett may have been found liable for conduct that was not, as defined, illegal.[141] Justice requires a retrial. Therefore, we will order a new trial for Bennett and Cohen on Campbell's retaliation claim.[142]

## Conclusion

There was sufficient evidence to support a verdict that Cohen and Bennett retaliated against Campbell for complaining about sex discrimination. However, the jury instructions on retaliation were fundamentally erroneous. Therefore, we will deny the defendants' motion for judgment notwithstanding the verdict and grant their motion for a new trial.

---

[141] Notably, both sides repeatedly suggested throughout trial that the retaliation claim was based on Campbell's visit to OED generally, not her complaint specifically. *See, e.g.*, Trial Tr. Vol. 3, 134:16–18 ("And to your knowledge, none of the students [who made medication errors but were not dismissed] went to OED to request an accommodation?"); Trial Tr. Vol. 4, 8:16–18 ("What role, if any, did plaintiff going to OED influence your actions about her?"); *id.* 49:11–14 ("Did the reasons that plaintiff was dismissed have anything to do with her pregnancy or her having gone to the Office of Equality and Diversity?").

[142] Because Campbell did not move for a new trial for defendants Drexel University or Tara Hafycz, our order for a new trial pursuant to Rule 59(d) is limited to a new trial for Bennett and Cohen.